T.C. Memo. 1997-404


UNITED STATES TAX COURT


WOODY F. LEMONS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

PAULA S. LEMONS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 16562-90, 16799-90.   Filed September 11, 1997.


<u>John D. Copeland</u> and <u>S. Cameron Graber</u>, for petitioners.

<u>Henry C. Griego</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, <u>Judge</u>:  Respondent determined deficiencies in, and additions to, the Federal income tax of each petitioner as follows:

Woody F. Lemons, Docket No. 16562-90

| | | Additions to Tax | | |
|---|---|---|---|---|
| | | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(a)(1) | 6661(a) | 6651 |
| 1986 | $230,650 | [1]$11,533 | $57,663 | -- |
| 1987 | 19,071 | [1]954 | 4,768 | -- |
| 1988 | 7,138 | 357 | 1,785 | -- |

Paula S. Lemons, Docket No. 16799-90

| | | Additions to Tax | | |
|---|---|---|---|---|
| | | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(a)(1) | 6661(a) | 6651 |
| 1986 | $195,644 | [1]$9,782 | $48,911 | -- |
| 1987 | 16,284 | [1]814 | 4,071 | -- |
| 1988 | 14,139 | 1,246 | 3,535 | $995 |

[1]Plus 50 percent of the interest due with respect to the portion of the underpayment attributable to negligence.

All section references are to the Internal Revenue Code as in effect during the years in issue.

After concessions, the issues for decision are: (1) Whether petitioners are entitled to an ordinary loss or to a capital loss due to the fact that eight memberships in the Moonlight Beach Club, Inc., owned by Mr. Lemons became worthless in 1986; (2) whether petitioners are entitled to deduct, as an ordinary and necessary business expense under section 162(a), the annual dues which Mr. Lemons allegedly paid in 1986 to the Moonlight Beach Club, Inc., by reason of his ownership of the eight club memberships; (3) whether petitioners' deductions of losses from various partnerships in 1987 and 1988 should be disallowed; (4) whether

petitioners are entitled to deduct in 1986 their basis in the stock of Windsor Resources, Inc., on the ground that the stock became worthless during the year; and (5) whether the self-employment tax reported by Mr. Lemons should be adjusted, as determined by respondent in the notice of deficiency, and whether the self-employment tax reported by Mrs. Lemons should be adjusted, even though no adjustment was made in the notice of deficiency.

FINDINGS OF FACT

The parties have stipulated some of the facts. The stipulation of facts filed by the parties and the accompanying exhibits are incorporated herein by this reference.

Petitioners are married individuals who filed separate returns for each of the years in issue. Respondent issued a separate notice of deficiency to each petitioner and each filed a petition for redetermination of the deficiency in this Court. At the time they filed their petitions, both petitioners resided in the State of Texas. The two cases were consolidated pursuant to Rule 141. All Rule references are to the Tax Court Rules of Practice and Procedure. Throughout this opinion, all references to petitioner are to Mr. Woody F. Lemons.

Petitioner received a degree in finance and banking from Texas Tech University in 1969. After graduation, petitioner was employed until 1972 by Shell Oil as a financial analyst. He then became employed by Vernon Savings & Loan (Vernon). In 1981, he became Vernon's president and chairman of its board. Petitioner left Vernon's employ in April 1986. For general background regarding petitioner and others involved in these cases, see Federal Sav. & Loan Ins. Corp. v. Dixon, 835 F.2d 554 (5th Cir. 1987); Little v. Commissioner, T.C. Memo. 1996-270.

Moonlight Beach Club Issue

During 1981, Mr. Don R. Dixon, a real estate developer in Dallas, Texas, bought a controlling interest in Vernon's stock. Several months later, he transferred the stock to a wholly owned company, Dondi Financial, Inc., that was formed for the purpose of holding the stock. After acquiring Vernon, Mr. Dixon caused all of his controlled corporations engaged in the real estate development business to be merged into or acquired by Vernon. He then formed Dondi Associates, Inc. (Dondi Associates), a Texas corporation, that was owned by members of his family for the purpose of engaging in real estate development.

At some time during the early 1980's, Mr. Dixon learned of beachfront property located in Encinitas, California, a town north of San Diego. The property consisted of two contiguous parcels of land (the Moonlight Beach Property). An old beach house, servants' quarters, and a detached garage stood on one parcel. The other parcel, consisting of approximately 17,000 square feet, was vacant. Mr. Dixon believed that he could develop the property by constructing a complex of six villas and other amenities on the vacant parcel, and by remodeling the beach house into a luxury duplex.

Initially, Mr. Dixon envisioned selling the six villas in so-called time-share units. However, based on discussions with lawyers and accountants who did not believe that the project could qualify under California laws regulating the sale of time-share units, Mr. Dixon decided to change the structure of the project and to use a "membership approach", under which a limited partnership or nonprofit corporation would purchase the six villas and would sell club memberships to the public. This structure was similar to the time-share approach in that each club membership would entitle its holder to use the club's facilities for a certain number of days per year. An integral part of the project was that the entire cost of acquiring and developing both parcels of property would be

financed by the sale of the six villas to be constructed on the vacant parcel.  After the development and sale of the six villas, the developers would own the luxury duplex and the land making up the first parcel free and clear.

As one of the first steps in acquiring and developing the subject property, Mr. Dixon agreed with the owner of a California construction company, Mr. Walter J. van Boxtel, to form a partnership, the Moonlight Beach Venture (hereinafter referred to as the joint venture).  On October 21, 1982, Dondi Properties, Inc. (Dondi Properties), a Texas corporation organized by Mr. Dixon, and Value Plus Industries, Inc. (Value Plus), Mr. van Boxtel's construction company, executed the Moonlight Beach Joint Venture Agreement (joint venture agreement).  Dondi Properties took an 80-percent interest in the joint venture, and Value Plus took a 20-percent interest.  The joint venture agreement states that Mr. van Boxtel and his wife had entered into a contract dated August 10, 1982, to purchase certain property described as "Lots 4, 5, 6, 11, 12 and 13 (including a closed street and alley) in Encinitas Pitchers Subdivision of the City of Encinitas, California."  The joint venture agreement describes the purposes of the venture in the following terms:

> (i) acquiring the Property [Moonlight Beach Property] pursuant to the terms of the Purchase

Contract,(ii) if the Venturers elect to do so, acquiring Lot 3 out of the referenced subdivision upon terms and conditions approved by the Venturer * * * (iii) renovating the Existing Improvements (defined in Section 3.06) and developing and improving the Property with the Additional Improvements (also defined in Section 3.06) (the said renovation, development and improvements being called the "Project") and (iv) selling the Additional Improvements in the ordinary course of the Venture's business.

The joint venture agreement delegated the management of the venture to Dondi Properties as manager and sales manager, and it appointed Value Plus to be development manager. The joint venture agreement addressed the scope of each partner's authority as follows:

Except as otherwise expressly and specifically provided in this Agreement, none of the Venturers shall have any authority to act for, or to assume any obligations or responsibility on behalf of, any other Venturer or the Venture.

On February 24, 1983, the joint venture agreement was amended (First Amended Agreement), by substituting Dondi Associates for Dondi Properties as a joint venturer. On April 14, 1984, the joint venture agreement was again amended (Second Amended Agreement) to permit petitioner to become a joint venturer. The Second Amended Agreement recites that Dondi Associates had sold, assigned, and transferred a 40-percent undivided interest in the capital and equity of the joint venture to petitioner. After this

transaction, the respective interests of the three partners in the "capital and assets" of the joint venture were as follows:  Dondi Associates--40 percent, Value Plus--20 percent, and petitioner--40 percent.

Attached to the joint venture's 1985 tax return are copies of the Schedules K-1, Partner's Share of Income, Credits, Deductions, etc., issued to each partner. According to the Schedules K-1, each partner's share of the profits, losses, and capital of the joint venture as of the end of 1985 was as follows:

| Partner | Profit Sharing | Loss Sharing | Ownership of Capital |
|---------|----------------|--------------|----------------------|
| Dondi Associates | 50% | 50% | 40% |
| Petitioner | 50 | 50 | 40 |
| Value Plus | -- | -- | 20 |

The Second Amended Agreement also reformulated the "management fee" to be paid to Value Plus.  That provision is as follows:

Section 3.09 Management Fees.

A.  In consideration of the Development Manager's services hereunder, the Venture shall pay to Value Plus as Development Manager a collective development, management and sales fee (the "Management Fee") equal to some of the following elements:

(1)  Fifteen percent (15%) of the approved "hard costs" of remodeling, refurbishing and preparing for sale the Existing Improvements (as defined in

the Joint Venture Agreement) located on the Subject Property including specifically, the existing house and servants' quarters, and;

(2) Five percent (5%) of the approved "hard costs" of construction of the Additional Improvements, as defined in the Joint Venture, and;

(3) Twenty percent (20%) of the "net profit" derived by the Venture from the sale or other disposition of the six units constituting the Additional Improvements.

B. The remaining "net profit" from the operation, sale, or other disposition of both the Existing Improvements and the Additional Improvements, shall be distributed equally to Dondi and Lemons, pro rata, according to their equity percentages in the Venture and no portions thereof, except for those items specifically set forth in Section 3.09, A, immediately above, shall inure to or be distributed to Value Plus.

C. Advances against the payments to be received by Value Plus as Development Manager pursuant to this Section 3.09 shall constitute the entire compensation due Value Plus from the Venture by reason of services rendered to the Venture or by reason of the contribution to the Venture of capital or by reason of Value Plus's equity interest in the Venture. Upon full and final payment to Value Plus of said Development Manager's compensation as aforesaid, Value Plus shall have no further right, title or interest in and to the Subject Property, the Existing Improvements or the Additional Improvements."

On June 1, 1984, the joint venture borrowed $4,700,000 from Anchor Savings of Shawnee Mission, Kansas (hereinafter referred to as Anchor), for the purpose of acquiring and developing the Moonlight Beach Property. Repayment of the

loan was due in 18 months. According to the loan closing statement, a reserve was established from the loan proceeds for construction costs in the amount of $2,879,500. The remaining proceeds of the loan, $1,820,500, were used to purchase the property and to pay other costs. Petitioner and Mr. Dixon both agreed to be personally liable for repayment of the loan.

After the Moonlight Beach Property was acquired, Value Plus, acting as the general contractor, commenced renovation of the existing improvements and construction of the six villas. The renovation and construction of the improvements took approximately 1 year and was substantially completed by the summer of 1985.

As mentioned above, Mr. Dixon initially contemplated the formation of a Texas limited partnership which would purchase the six villas and related land from the joint venture and would sell 36 limited partnership interests to the public. Each limited partnership interest would entitle the holder to the use of a villa for 60 days per year. That plan was described in a promotional booklet that was prepared sometime before completion of the construction phase of the project as follows:

Participating ownership in Moonlight Beach Club will be offered in the form of a limited partnership interest in a Texas limited partnership composed of 36 limited partners and

three (managing) general partners. The general
partners will be Don R. Dixon, Woody F. Lemons,
and W.J. Van Boxtel to be called Moonlight Beach
Club, Ltd.  The limited partnership will own six
oceanside villas and a 1/36 limited partnership
will provide each partner with full membership in
Moonlight Beach Club including 60 days residence
per year in one of the six villas.  * * * Each
full partnership in Moonlight Beach Club provides
for 1/39 ownership in the land, all improvements,
furniture, furnishings and equipment.  * * *
Annual dues will be set to cover all insurance,
staff services, equipment, automobile costs,
interior and exterior maintenance, housekeeping,
pantry and cellar stocking.  These dues are
estimated to be approximately $4,000.00 for the
initial year, per full partner, under current
conditions.

The structure contemplated by the promotional booklet,
quoted above, was not used.  Rather, Mr. Dixon and
petitioner formed a Texas nonprofit corporation, Moonlight
Beach Club, Inc. (hereinafter referred to as the club or
beach club), in lieu of the Texas limited partnership
mentioned in the promotional booklet.  The club purchased
the six villas and related land from the joint venture
and sold club memberships to the public.  Each membership
in the club entitled the holder to the exclusive use of one
of the six villas for a specified period of time per year.

The record of these cases contains the Restated
Articles of Incorporation of the club that were filed in
the Office of the Secretary of State of Texas on
September 6, 1985 (hereinafter referred to as Restated

Articles).  The record also contains the First Amended Bylaws of the club, dated July 30, 1985 (hereinafter referred to as First Amended Bylaws).

The First Amended Bylaws describes the purposes of the club in the following terms:

> Purposes.  The primary purposes for which Moonlight Beach Club, Inc. (the "Corporation") has been formed are to acquire and own certain real property (the "Land") consisting of approximately 17,000 square feet of land at 130 Fifth Street in the City of Encinitas, County of San Diego, State of California, and to own, operate, and maintain a beach club thereon (the "Club") exclusively for the benefit, pleasure and recreation of its Members (defined below).  The Club consists of six (6) residential units (the "Units" or, if only one, the "Unit") with each Unit containing approximately 2,000 square feet of living space, with a television, music system, fireplace, and certain furniture, furnishings, and other items included within each of the Units (the "Interior Amenities").  The Club also consists of, in addition to the Units and Interior Amenities, certain other amenities (the "Exterior Amenities"), including, but not limited to, a swimming pool, security gate, and an automobile for each Unit (the Land, Units, Interior Amenities, and Exterior Amenities may sometimes be collectively referred to herein as the "Club Facilities").

According to the Restated Articles and the First Amended Bylaws, there were to be three classes of membership in the beach club:  Classes A, B, and C.  Each class A membership entitled its holder to the exclusive use of one of the villas for 60 days per year in consideration of the

payment of a "membership fee" of $15,000 and an "initiation fee" of $140,000. Each class B membership entitled its holder to the exclusive use of one of the villas for 30 days per year in consideration of the payment of a "membership fee" of $7,500 and an "initiation fee" of $70,000. The club's Restated Articles and First Amended Bylaws provide that class B members would be sold only in pairs, and each pair of class B members would reduce the number of class A memberships by one.

Each class C membership entitled its holder to the exclusive use of one of the villas for 10 days per year in consideration of the payment of a "membership fee" of $2,500 but no "initiation fee". Class C memberships were given to Mr. Dixon, petitioner, and Mr. Ralph Armstrong, who are specifically named in the club's Restated Articles and First Amended Bylaws as class C members. Mr. Armstrong is a real estate broker in San Antonio whom Mr. Dixon and petitioner retained to manage the marketing of the project.

The maximum number of days on which all six villas could be used during the year is 2,190 (i.e., 6 villas x 365 days). The club's Restated Articles and First Amended Bylaws specify that the number of class A memberships would be no more or less than 36. Because each class A membership entitled its holder to use a villa for 60 days

during the year, the 36 class A memberships account for 2,160 of the available days on which the complex could be used during the year (i.e., 36 memberships x 60 days).  The 30 remaining available days were allocated to the class C memberships.  Under the Articles and Bylaws, the total number of class C memberships is three, and each class C membership entitled its holder to use a villa for 10 days per year.

The consideration specified in the Restated Articles and First Amended Bylaws for each class A membership is $155,000 (i.e., "membership fee" of $15,000 and "initiation fee" of $140,000).  Typically, a prospective member paid the membership fee in cash and issued a promissory note, payable to the club, for the initiation fee.  Thus, the total consideration that the club would receive from the sale of 36 class A memberships is $5,580,000.  The consideration specified in the Restated Articles and First Amended Bylaws for each class C membership is $2,500 (i.e., "membership fee" of $2,500 and no "initiation fee").  Thus, the total consideration that the club would receive from the sale of three class C memberships is $7,500.  The maximum amount of money that the club could realize from the sale of 36 class A memberships and three class C memberships was $5,587,500 (i.e., $5,580,000 plus $7,500).

The First Amended Bylaws specify the voting rights of each class of membership as follows:

> Voting.  Class A Members shall each have two (2) votes, Class B Members shall each have one (1) vote, and Class C Members shall each have one (1) vote, respectively, on any and all matters to be voted on by the Members.  Moreover, no class voting shall take place or is permitted on any matter.  However, notwithstanding the foregoing statement that each Class C Member shall have one (1) vote on any and all matters to be voted on, prior to the date that Members other than Class C Members collectively possess, in the aggregate, more than sixty-six (66) votes, Class C Members shall each have twenty-two (22) votes on any and all matters to be voted on by the Members.

The First Amended Bylaws prohibit members of the club from renting the use of a villa.  The First Amended Bylaws provide as follows:

> No Rental Rights.  Any Member may permit a guest, friend, client, or business associate (collectively referred to herein as the "Guests" or, if only one, the "Guest") to use a Unit which such Member has rightfully and properly reserved or is otherwise entitled to use; provided, however, that no Member can rent or otherwise receive any consideration from the Guest for such permitted use.  It is the intent of the corporation to provide the use of the Club Facilities and, more specifically, the Units only to Members and any other persons to whom such Members desire to gratuitously grant rights of use.

Shortly before completion of the construction phase of the project, Mr. Dixon and petitioner began marketing

memberships in the club.  They directed their marketing efforts toward individuals who were the principals of "small to medium-size Texas corporations that were expanding their business activities into the Southern California area."  Mr. Dixon and petitioner caused the promotional booklet described above to be prepared, and they drew up a list of prospective buyers.  They sent letters and copies of the promotional booklet to the prospective buyers on the list, and shortly thereafter they made followup contacts with those persons.

During the period from May or June of 1985 through the end of that year, Mr. Dixon, petitioner, and Mr. Armstrong encouraged a number of prospective buyers to fly from Texas to Southern California to visit the project.  Vernon paid for their airfare to California, and the joint venture paid for their expenses in California.  An individual who was employed by the club to manage the project, Mr. Michael Osuna, was responsible for attending to the needs of the prospective buyers while they were staying at the project.

On September 19, 1985, the joint venture transferred to the beach club the portion of the Moonlight Beach Property which included the six condominium units.  The deed for the transfer was recorded by the club on December 3, 1985.  The club took title to the Moonlight

Beach Property subject to the $4,700,000 loan from Anchor, and it issued a promissory note, payable to the joint venture, in the amount of $887,500 (i.e., $5,587,500 less $4,700,000). Both the joint venture and the beach club treated the transfer of the Moonlight Beach Property as having occurred on or about January 16, 1986, the date on which the permanent loan was funded and the construction loan was paid off, as discussed below. The joint venture retained title to the parcel of land on which the beach house was located.

On December 23, 1985, an application to register the project under the Texas Time-share Act was filed with the Texas Real Estate Commission. The application was filed on behalf of the beach club by the club's accountant, Mr. Tom D. Winslett II. On August 6, 1986, the Texas Real Estate Commission notified the club that, as a condition precedent to registration in Texas, the project would have to be registered and qualified in the State of California. Originally, Mr. Dixon and petitioner had not sought to register the project in California. In part, this was due to the fact that they had been advised that the project would not qualify under California law because of a so-called blanket encumbrance problem. That is, under the proposed structure of the transaction, the permanent lender

could declare the entire project in default if the club failed to remit a mortgage payment, even though members of the club had timely made all of their note payments to the club.

After receiving the August 6, 1986, letter from the Texas Real Estate Commission, Mr. Winslett, acting on behalf of the club, authorized attorneys to seek registration of the project in California. Also, discussions were held with representatives of the permanent lender, Sandia Federal Savings & Loan (Sandia), to see if Sandia would allow the permanent loan to be amended to alleviate the blanket encumbrance problem by releasing members who had fully paid their initiation fee note. Ultimately, these discussions were not successful and registration was never obtained in either Texas or California.

On or about January 16, 1986, the beach club secured permanent financing for the project from Sandia. On that date, Mr. Dixon, acting as the club's president, and petitioner, acting as the club's secretary, executed a secured promissory note to Sandia in the principal amount of $4,760,000, payable in 60 equal payments of $181,308.08 each, due on the 15th day of each July, October, January, and April during the term of the loan, commencing on

April 15, 1986, and ending January 15, 2001. The note states that payment of the note is secured as follows:

> Security. This Note is secured by Maker's [i.e., the club's] assignment of those certain Class A Initiation Fee Notes pursuant to that certain Collateral Assignment of Notes and Security Agreement of even date herewith. This Note is further secured by, among other things, a Deed of Trust and Assignment of Rents of even date herewith (the "Trust Deed") to First American Title Insurance Company, as Trustee, covering certain real property situated in the County of San Diego, State of California. Reference is made to the Deed of Trust with respect to the rights of acceleration of the indebtedness evidenced by this Note.

Mr. Dixon and petitioner also personally guaranteed the loan from Sandia. The club used the proceeds of the loan from Sandia in the amount of $4,760,000 together with other funds to retire the construction loan from Anchor, the principal and interest on which amounted to $4,870,457.16 through January 17, 1986.

By the end of 1985, before the interim construction loan became due, prospective purchasers had committed to buy only 18 of the 36 class A memberships. However, as a condition for providing permanent financing for the project, Sandia required that all the time-share memberships be sold. Therefore, in order to obtain permanent financing, Mr. Dixon and petitioner each

purchased nine class A memberships in the club. On or about January 16, 1986, in connection with the closing of the club's loan from Sandia, Mr. Dixon and petitioner each paid $135,000 in cash to the club (i.e., $15,000 x 9) and signed nine promissory notes payable to the club, in the aggregate principal amount of $1,260,000 (i.e., $140,000 x 9). Mr. Dixon and petitioner each borrowed the cash payment of $135,000 from the joint venture. These loans were never repaid.

On or about January 24, 1986, petitioner sold one of his club memberships to a California resident, Mr. Jack Anderson, for $155,000. As discussed in more detail below, each petitioner reported one-half of this sale on a Schedule C, Profit or (Loss) from Business or Profession, filed with his or her 1986 return. Petitioner and Mr. Dixon used the toss of a coin to determine that Mr. Anderson would purchase one of petitioner's club memberships. They agreed that the next club membership to be sold would be one of Mr. Dixon's and that they would alternate until all of the club memberships were sold.

On November 2, 1986, the joint venture agreement was again amended (Third Amended Agreement), to liquidate Value Plus' interest in the joint venture in consideration of the venture's payment of $75,000 pursuant to a promissory note.

The promissory note was to accrue interest at the annual rate of 9 percent and was to mature on November 30, 1986. Payment of the note was personally guaranteed by Mr. Dixon and petitioner.  The Third Amended Agreement also provides as follows:

> All remaining net profits of the Joint Venture, determined in accordance with the provisions of the Joint Venture Agreement, not otherwise payable to [sic] distributable to Value Plus pursuant to Paragraph 2 of this Third Amendment [the paragraph providing for the note described above], shall be paid over, share and share alike to Dondi and Lemons [petitioner].

Thus, after the Third Amended Agreement, the equity and capital of the joint venture were held by Dondi Associates and petitioner on a 50-50 basis, and Value Plus was formally withdrawn as a joint venturer.  One of the recitals of the Third Amended Agreement states as follows:

> On January 16, 1986, the Joint Venture conveyed a portion of the Subject Property to Moonlight Beach Club, Inc., a Texas corporation. The profits to the Joint Venture from such sale and disposition is conditioned upon the sale by Moonlight Beach Club, Inc. of various membership units in said Club.  Until complete sale and disposition of said units, it is not possible to determine the exact net profit to the Joint Venture from such sale and disposition. Accordingly, the parties desire by this Agreement to settle and liquidate the amount of net profit due Value Plus pursuant to the terms of the Joint Venture Agreement rather than waiting

for the final sale of all units in Moonlight
Beach Club, Inc.

In mid to late 1986, a number of club members stopped making payments on their initiation fee notes. As a result, the club defaulted on the permanent loan owed to Sandia. About this time, petitioner realized that he would not be able to resell his eight memberships in the club. Accordingly, since the club was in default on the permanent loan, and Sandia's foreclosure of the land and improvements owned by the club seemed imminent, petitioner considered his memberships in the club to be worthless.

Mr. Winslett prepared the joint venture's 1984 and 1985 tax returns. However, Mr. Winslett did not prepare the joint venture's 1986 return because all of the financial records of Dondi Associates and the joint venture had been either seized by the FBI or subpoenaed by a grand jury in connection with an investigation into Vernon's activities. Accordingly, Mr. Winslett and petitioner's accountant, Mr. Garry L. David, estimated the joint venture's profit in 1986 from the transfer of the Moon-light Beach Property to the club. They estimated that petitioner's share of the profit was $664,200. The record of these cases does not explain the basis for that estimate. Based thereon, the aggregate gain realized by

the joint venture from its sale of villas and land to the club in 1986 amounted to $1,328,400.

During 1986, petitioner, along with his wife, was active in attempting to organize a corporation called First Equity Mortgage.

On June 24, 1987, the club's board of directors adopted a resolution that the club should either voluntarily file for bankruptcy under chapter 11 of the U.S. Bankruptcy Code, consent to entry of an involuntary chapter 11 petition, or request the bankruptcy court to convert any involuntary chapter 7 petition filed to a chapter 11 proceeding. On July 6, 1987, the club informed its members that on June 25, 1987, it had filed for protection under chapter 11 of the U.S. Bankruptcy Code.

On or about December 4, 1987, the Superior Court of California, County of San Diego, entered a default judgment against petitioner for $1,132,239.38 in favor of Sandia. Sandia caused the default judgment to be filed in the District Court for Dallas County, Texas.

Prior to April of 1986, petitioner was under investigation for criminal bank fraud and conspiracy with respect to his activities at Vernon. Petitioner was convicted and sentenced to serve two consecutive 5-year terms in prison. Petitioner's sentence was subsequently reduced to 5 years

in consideration of his cooperation with the Government in connection with its investigations of other savings and loan associations.

In December 1990, Mr. Dixon was convicted on 23 counts of bank fraud and was sentenced to serve a term of 5 years in prison. In July of 1992, Mr. Dixon entered into a plea bargain with respect to eight other counts of bank fraud for which he had been indicted. He was sentenced to serve another term of 5 years in prison, with the second term to run consecutively with the first. Mr. Dixon ultimately served 44 months in prison. As part of his 1992 plea bargain, Mr. Dixon cooperated with the Government in its investigations of other savings and loan associations. Mr. Dixon testified in two trials about criminal activities at Vernon.

The separate 1986 income tax returns filed by petitioners include identical Schedules C, Profit or (Loss) From Business or Profession, for a business described as "Time-Share Unit Sales". Each petitioner reported one-half of the amount realized from the sale of a club membership to Mr. Anderson, $77,500, as "Gross receipts or sales" from that business. Each petitioner also reported the same amount, $77,500, as "Cost of goods sold" and accordingly, reported no gross profit from that business.

Each petitioner also reported on the Schedule C an ordinary loss in the amount of $620,000, labeled "Loss on worthlessness of eight Moonlight Beach Club time-share Memberships which Could Not Be Sold."  This amount is one-half of the aggregate cost of the eight club memberships held by petitioner when the project collapsed ($155,000 x 8 = $1,240,000).

Finally, each petitioner reported on a Schedule E, Supplemental Income Schedule, one-half of petitioner's share of the estimated gain realized by the joint venture from its sale of the six villas and land to the club. Thus, each petitioner reported gain in the amount of $332,100 (i.e., one-half of $664,200).  The return of each petitioner states that the "amount shown is an estimate."

In the subject notices of deficiency, respondent disallowed the loss that each petitioner claimed on his and her 1986 return in the amount of $620,000 due to the worthlessness of eight memberships in the club.  The notices give the following explanation of these adjust- ments:  "Since nonbusiness worthlessness of assests [sic] must be treated as capital losses, we have adjusted your income as shown in the accompanying schedule."  The notices of deficiency permit petitioners to treat the loss from the worthlessness of the club memberships as long-term capital

loss. However, in computing the long-term capital loss, it appears that respondent treated petitioner as having a basis of $1,120,000 in the eight memberships, or $140,000 per membership, rather than a basis of $1,240,000, or $155,000 per membership.

Annual Dues Issue

At the time petitioner purchased 9 of the 18 unsold class A memberships in the club, he signed membership documents identical to those signed by the other members. He thereby obligated himself to pay the annual dues attributable to each membership. As described by the promotional booklet issued to prospective purchasers, the dues covered various expenses, including insurance, staff services, such as the manager's salary, and maintenance costs incurred in running the club. According to the booklet, the dues were estimated to be approximately $4,000 for the first year. Based upon the eight class A memberships that petitioner held during 1986, it would appear that he was liable to pay $32,000 in dues during the year.

On the Schedules E, Supplemental Income Schedule, that are attached to petitioners' 1986 income tax returns, each petitioner claims a deduction of $5,250 for "management fees" attributable to the beach club.

Respondent disallowed the deductions, and both notices of deficiency give the same explanation for these adjustments: "Because there is no business purpose for this transaction your deduction is denied."

## Partnership Loss Issue

Petitioner's 1987 and 1988 income tax returns claim deductions on Schedule E, Supplemental Income Schedule, for partnership losses in the aggregate amounts of $97,789.65 and $21,986.69, respectively. Set out below is a schedule of the partnership losses claimed in each year:

| Petitioner's Income Tax Returns | 1987 | 1988 |
|---|---|---|
| Speed Line Investment | ($2,091.48) | ($2,035.02) |
| Oakbrook III, Ltd. | (32,104.53) | (12,453.97) |
| Dondi Presidents' Partnership II | (7,050.85) | 422.35 |
| 1626 NY Associates Ltd. Partnership | (24,273.40) | (4,931.60) |
| Bear Creek West Rental Properties | (6,035.00) | -- |
| Haywood Lane Joint Venture | (10,102.50) | -- |
| Murfreesboro Road Joint Venture | (9,082.00) | -- |
| Lemons & Hite | (751.37) | (646.29) |
| Dondi Motor Car Properties | (2,166.00) | (2,283.98) |
| Berkley Apartments Ltd. Partnership | (4,067.51) | (640.68) |
| Caprice Investments | (271.51) | -- |
| Freeport-McMoran | 206.50 | 594.00 |
| Energy Partners., Ltd. | -- | -- |
| Freeport-McMoran | -- | 6.50 |
| Resource Partners., Ltd. | -- | -- |
| | (97,789.65) | (21,968.69) |

Mrs. Lemons' returns claim identical deductions.

The notices of deficiency issued to petitioners adjust the above partnership losses by disallowing $57,634 of the amount claimed in 1987 and $29,448 of the amount claimed in 1988. Both notices of deficiency provide the following

explanation of these adjustments:  "We decreased your partnership loss deduction because it is more than the amount you have 'at risk.'"  Neither notice of deficiency sets forth any further explanation or itemizes the computation of the amount of the adjustment.

Respondent's post-trial brief states that respondent disallowed the following losses claimed on petitioner's Schedules E for 1987 and 1988:

| Amounts Disallowed | 1987 | 1988 |
|---|---|---|
| Speed Line Investment | ($2,091.48) | ($2,035.02) |
| Oakbrook III, Ltd. | | (12,453.97) |
| Dondi Presidents' Partnership II | (7,050.85) | (1,431.15) |
| 1626 NY Associates Ltd. Partnership | (24,273.40) | (4,931.60) |
| Bear Creek West Rental Properties | (6,035.00) | -- |
| Haywood Lane Joint Venture | (10,102.50) | -- |
| Murfreesboro Road Joint Venture | (9,082.00) | -- |
| Lemons & Hite | -- | -- |
| Dondi Motor Car Properties | -- | -- |
| Berkley Apartments Ltd. Partnership | -- | -- |
| Caprice Investments | -- | -- |
| Freeport-McMoran Energy Partners, Ltd. | -- | -- |
| Freeport-McMoran Resource Partners, Ltd. | -- | -- |
| Total | (58,635.23) | (20,851.74) |
| Amount disallowed per notice of deficiency | 57,634.00 | 29,448.00 |
| Difference | (1,001.23) | 8,596.26 |

The aggregate partnership losses disallowed in 1987, according to the notices of deficiency, $57,634, is $1,001.23 less than the amount disallowed according to respondent's post-trial brief.  Respondent's post-trial brief states that this discrepancy is:  "due to the nature of the § 469 (passive activity loss) computational

adjustment required.  The final adjustment to Schedule E will be submitted under Rule 155."

The aggregate partnership losses disallowed in 1988, according to the notices of deficiency, $29,448, is $8,596.26 more than the above amount disallowed according to respondent's post-trial brief.  Respondent's post-trial brief states this discrepancy is:

> due to a computational error.  Respondent con-
> cedes the difference between the Notice amount
> and this amount, subject only to a further
> correction due to the section 469 computational
> adjustment.  (See the previous note.)

The Schedules K-1, Partner's Share of Income, Credits, Deductions, etc., issued to petitioner by the subject partnerships for 1987 state the following:

1987 Tax Year

| Partnership | Beginning Capital Account | Distributive Share Ordinary Income (Loss) | Other Income (Loss) | Contributed Capital for Year | Withdrawals and Distributions | Ending Capital Account |
|---|---|---|---|---|---|---|
| Speed Line Investment[1] | ($32,602.00) | ($4,806.00) | ($1,553.00) | -- | -- | ($38,961.00) |
| Oakbrook III, Ltd.[2] | (369,191.00) | (77,242.00) | -- | -- | -- | (446,433.00) |
| Dondi Presidents' Partnership II | (38,049.00) | (16,785.00) | -- | -- | -- | (54,834.00) |
| 1626 NY Associates, Ltd. Partnership[2] | (81,453.56) | (58,064.00) | -- | $26,259.00 | -- | (112,988.56) |
| Bear Creek West Rental Properties | (14,320.00) | (12,070.00) | (4,450.00) | 2,044.00 | ($28,796.00) | -- |
| Haywood Lane Joint Venture[2] | (10,649.00) | (20,205.00) | (24.00) | -- | (30,878.00) | -- |
| Murfreesboro Road Joint Venture[1] [2] | (9,800.00) | (18,029.00) | (25.00) | -- | (27,854.00) | -- |

[1]Capital account information on Schedule K-1 was supplied by petitioner's accountant, Mr. Garry L. David.

[2]Petitioner had a limited partnership interest only.

The Schedules K-1 issued by the partnerships for 1988 state the following:

1988 Tax Year

| Partnership | Beginning Capital Account | Distributive Share Income (Loss) | Other Income (Loss) | Contributed Capital for Year | Withdrawals and Distributions | Ending Capital Account |
|---|---|---|---|---|---|---|
| Speed Line Investment | ($38,961.00) | ($3,178) | -- | -- | -- | ($42,139.00) |
| Oakbrook III, Ltd. | (446,433.00) | (11,875) | $419,639 | -- | -- | (38,669.00) |
| Dondi Presidents' Partnership II[1] | (54,834.00) | (3,707) | 16,921 | -- | ($35,206) | -- |
| 1626 NY Associates Ltd. Partnership | (112,900.56) | (44,640) | -- | -- | -- | (157,628.56) |

[1]Petitioner had a limited partnership interest only.

According to the Schedules K-1, petitioner's share of the liabilities of each partnership is as follows:

| Partnership | 1987 | | 1988 | |
|---|---|---|---|---|
| | Other | Nonrecourse | Other | Nonrecourse |
| Speed Line Investment | -- | -- | -- | -- |
| Oakbrook III, Ltd. | -- | $638,108 | -- | -- |
| Dondi Presidents' Partnership II | $27,934 | 65,700 | -- | -- |
| 1626 NY Associates Ltd. Partnership | 53,057 | 428,488 | $57,352 | $309,682 |
| Bear Creek West Rental Properties | -- | -- | [1] | [1] |
| Haywood Lane Joint Venture | -- | -- | [1] | [1] |
| Murfreesboro Road Joint Venture | -- | -- | [1] | [1] |
| Total | 80,991 | 1,132,296 | 57,352 | 309,682 |

[1]A Schedule K-1 was not entered into evidence.

During the audit of petitioners' 1987 and 1988 returns, respondent's revenue agent noted that petitioner's ending capital, as shown on the Schedules K-1 issued by the partnerships, consisted of negative amounts. Respondent's revenue agent asked petitioners' representatives why petitioners had deducted losses in excess of their basis in each of the partnerships. Petitioners' representatives stated that their practice was to deduct the amount of any loss shown on a Schedule K-1, irrespective of the taxpayer's basis in the partnership. Respondent's agent also asked petitioners' representatives to substantiate the amount of any liabilities that would increase petitioner's basis in any of the partnerships. Petitioners did not provide any substantiation to respondent's agent.

## Worthless Stock Issue

On the Schedules D, Capital Gains and Losses, filed with their 1986 tax returns, both petitioners reported a long-term capital loss in the amount of $4,441.35 that is labeled "Windsor Resources". Respondent disallowed these losses in the notices of deficiency.

## Self-Employment Tax

For 1987, each petitioner filed a Schedule SE, Computation of Social Security Self-Employment Tax, with

his or her return and reported self-employment tax of
$2,334.87.  It appears that the self-employment tax
computed by each petitioner for 1987 is based upon one-
half of the net earnings from three businesses reported
on Schedules C and a net loss from one or more farm
partnerships.  A summary of the self-employment tax
computed by each petitioner for 1987 is as follows:

|  |  | 1987 |
| Self-Employment Tax | Total | 1/2 Share |
| --- | --- | --- |
| Schedule C, Production-Oil & Gas | $61.30 | $30.65 |
| Schedule C, Financial Adviser and investments | 40,706.81 | 20,353.41 |
| Schedule C, Pilot Lessons- Charter Flights | (286.75) | (143.38) |
| Net Profit from Schedule C & Schedule K-1 | 40,481.36 | 20,240.68 |
| Net Farm Profit or Loss from Schedule F & Farm Partnerships | (2,516.00) | (1,258.00) |
|  | 37,965.36 | 18,982.68 |
| Rate | 0.123 | 0.123 |
| Self-employment tax | 4,669.74 | 2,334.87 |

For 1988, each petitioner filed a Schedule SE, Social
Security Self-Employment Tax, with his or her return and
reported self-employment tax of $1,100.47.  It appears
that the self-employment tax computed by each petitioner
is based upon one-half of the net earnings from four
businesses reported on Schedules C, the income from two
joint ventures reported as miscellaneous income, and a net

loss from one or more farm partnerships.  A summary of the
self-employment tax computed by each petitioner for 1988 is
as follows:

1988

| | |
|---|---:|
| Schedule C, Production-Oil & Gas | $26.15 |
| Schedule C, Financial Adviser & Investments | 5,789.01 |
| Schedule C, Pilot Lessons-Charter Flights | (531.25) |
| Schedule C, Coin Dealer | (85.77) |
| Joint Venture--Middleton | 750.00 |
| Joint Venture--Tex-Mart | 4,211.00 |
| | |
| Net Profit from Schedule C & Schedule K-1 | 10,159.14 |
| Net Farm Profit or Loss from Schedule F & Farm Partnerships | (1,707.00) |
| | 8,452.14 |
| Rate | 0.1302 |
| | |
| Self-employment tax | 1,100.47 |

The notice of deficiency issued to petitioner
determined that his self-employment taxes for 1987 and 1988
are $4,465 and $4,935, respectively.  The only explanation
of this adjustment in the notice of deficiency is the
following:  "We have adjusted your self-employment tax due
to a change in your net profit from this self-employment."
The notice of deficiency issued to Mrs. Lemons did not
adjust the self-employment tax that she reported.

OPINION

Moonlight Beach Club Issue

The principal issue in these cases involves the
characterization of the loss petitioner realized in 1986

when eight memberships in the beach club became worthless. Generally, a taxpayer is allowed to deduct any loss sustained during the taxable year that is not compensated by insurance or otherwise. Sec. 165(a). The amount of the deduction is the taxpayer's adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. Sec. 165(b). In the case of an individual, the deduction is limited to: (1) Losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) casualty losses. Sec. 165(c). Furthermore, if the loss is one that arose from the sale or exchange of a capital asset, then the deduction in the case of a taxpayer other than a corporation is subject to the limitation on capital losses set forth in section 1211(b). Sec. 165(f). Under that limitation, the taxpayer is allowed to deduct losses from the sale or exchange of capital assets only to the extent of gains from the sale or exchange of capital assets plus $3,000. Sec. 1211(b). If there is excess capital loss, the taxpayer is permitted to carry over the excess to the succeeding taxable year. Sec. 1212(b).

As discussed above, the return filed by each petitioner claims a deduction from gross income in the

amount of $620,000.  Respondent determined in the notices of deficiency that petitioners are not entitled to deduct ordinary losses of $620,000, but are entitled to deduct long-term capital losses of $560,000.  Several aspects of respondent's determinations should be noted.  First, respondent's determinations that petitioners realized capital losses in 1986 are, in effect, determinations that the losses qualify under section 165(c)(1) as losses incurred in a trade or business, or under section 165(c)(2) as losses incurred in a transaction entered into for profit.  We have no reason, to conclude that respondent determined that the losses arose from a casualty within the meaning of section 165(c)(3).

Second, respondent determined that the amount of the capital loss that can be deducted by each petitioner is $560,000, rather than $620,000, the amount claimed on their returns.  In effect, respondent determined that petitioner's basis in the eight club memberships that became worthless was $1,120,000 (i.e., 2 x $560,000), rather than $1,240,000 (i.e., 2 x $620,000).  Presumably, respondent agreed that petitioner's basis included each of the eight initiation fee notes payable to the club in the principal amount of $140,000, but did not include the membership fees of $15,000, for each membership that

petitioner acquired with funds borrowed from the joint venture. However, one of the findings of fact requested by petitioners in their post-trial brief states as follows: "Petitioners basis in the partnerships which became worthless was $1,240,000." Respondent answered "no objection" to this requested finding and, in effect, conceded this issue.

Third, respondent determined that Mr. Lemons had realized a long-term capital loss in 1986. "Long-term capital loss" means loss from the sale or exchange of a capital asset held for more than 1 year. Sec. 1222(4). In these cases, Mr. Lemons purchased the nine club memberships on or about January 16, 1986, at the time the beach club closed the loan transaction with the permanent lender, Sandia. The parties agree that the club memberships had become worthless by the end of 1986. Petitioners disagree that the losses should be treated as capital losses but they have not raised an issue about the treatment of the losses as long-term capital losses, rather than as a short-term capital losses.

Fourth, respondent determined that the subject losses arose from the sale or exchange of capital assets, the club memberships. See sec. 165(f). Respondent's brief acknowledges that the club memberships became worthless and

makes reference to section 165(g), which provides that the loss from a "security" which is a capital asset that becomes worthless during the taxable year shall be treated as a loss from a sale or exchange. Petitioners argue that the club memberships are not capital assets, but they do not question respondent's determination that they were sold or exchanged. Petitioners do not argue that they are entitled to ordinary loss treatment, even if the club memberships are capital assets, on the ground they were not sold or exchanged. See generally Leh v. Commissioner, 260 F.2d 489 (9th Cir. 1958), affg. 27 T.C. 892 (1957); Commissioner v. Pittston Co., 252 F.2d 344 (2d Cir. 1958), revg. 26 T.C. 967 (1956).

Petitioners contend that they are each entitled to deduct against ordinary income in 1986 one-half of Mr. Lemons' basis in the subject club memberships, viz. $620,000. Petitioners make two arguments in support of that position. First, they argue that the subject club memberships were not capital assets in Mr. Lemons' hands because he held the memberships "primarily for sale to customers in the ordinary course of his trade or business". Sec. 1221(1). Petitioners assert that Mr. Lemons' primary purpose for holding the club memberships was for sale to customers. According to petitioners, that purpose is

evident from the fact that he had no other purpose for holding the club memberships. They claim that he did not hold the club memberships for personal or family use, for rental income, or for investment. Petitioners also assert that Mr. Lemons was engaged in the trade or business of selling memberships since the joint venture was engaged in developing the Moonlight Beach property and petitioner and Mr. Dixon "were simply carrying out their original development plan when they 'subpurchased' the (18) unsold memberships in their own names." Petitioners cite cases involving the distinction between a "dealer" and an "investor" in real property and argue that the factors used in those cases show that petitioner's activities "rise to the level of trade or business." Finally, they contend that the factors identified in the regulations promulgated under section 183 also show that petitioner was engaged in a trade or business.

Petitioners' second argument is that they are entitled to a deduction because the subject loss was incurred in a transaction entered into for profit and is fully deductible under section 165(c)(2). Petitioners cite Meyer v. Commissioner, T.C. Memo. 1975-349, affd. 547 F.2d 943 (5th Cir. 1977), and other cases and argue that the characterization of the loss should be based on the "origin

of the claim" and that the Court should "look-back" to the nature of the asset in the hands of the joint venture.

Respondent argues that petitioner was not holding the club membership for sale to customers. Respondent also argues that petitioner was not in the business of selling club memberships, nor was he acting as a nominee of the joint venture. According to respondent, petitioner purchased the memberships to assist the club "in obtaining permanent financing for its project" and thereby to ensure that the joint venture "would ultimately profit from the project." Respondent cites Whipple v. Commissioner, 373 U.S. 193 (1963), and compares petitioner's purchase of the memberships "to a stockholder lending funds to his corporation to improve its financial condition, which in itself does not amount to a trade or business." Respondent argues that "petitioner was acting as MBC'S [the club's] agent in selling his time-share memberships, and, thus, held the memberships 'primarily' for the benefit of MBC." Respondent denies petitioners' assertion that petitioner purchased the memberships to complete the joint venture's original development plan. If that were true, respondent asks why the joint venture did not purchase the unsold memberships. According to respondent, petitioner purchased the unsold memberships as a matter of tax planning so they

could argue that any gain was attributable to the sale of a capital asset, and that any loss was attributable to the sale of a noncapital asset. Respondent argues that the factors identified in cases distinguishing real estate dealers from investors show that petitioner was an investor. In applying those factors, respondent focuses on petitioner's activities after he acquired the memberships and does not take into account any of the activities of the joint venture.

The issue we must decide is whether the subject club memberships were capital assets in petitioner's hands. Section 1221 defines the term "capital asset" to mean "property held by the taxpayer", except for the property that falls into five enumerated categories. The first category of property excluded from the definition of capital asset is the following:

> (1)stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

Sec. 1221. The statute requires a two-pronged inquiry: First, whether the taxpayer held the property "primarily for sale to customers", and second, whether the taxpayer

held the property for sale "in the ordinary course of his trade or business".  E.g., Cottle v. Commissioner, 89 T.C. 467, 486-487 (1987); Buono v. Commissioner, 74 T.C. 187, 199-200 (1980); Howell v. Commissioner, 57 T.C. 546, 555 (1972).

The purpose of section 1221(1) is to differentiate between the profits and losses arising from the every-day operation of a business, on the one hand, and the realization of appreciation in value accrued over a substantial period of time, on the other hand.  E.g., Bramblett v. Commissioner, 960 F.2d 526, 534 n.2 (5th Cir. 1992), revg. T.C. Memo 1990-296 (1990); Devine v. Commissioner, 558 F.2d 807, 814 (5th Cir. 1977), affg. T.C. Memo. 1975-251 (1975).  In the context of section 1221(1), the word "primarily" means "of first importance" or "principally".  Malat v. Riddell, 383 U.S. 569, 572 (1966).  Thus, if a taxpayer has several reasons for holding property, the sale purpose must be more than substantial; it must be the primary purpose.  Ferguson v. Commissioner, T.C. Memo. 1987-257.

Petitioners bear the burden of proving that the club memberships in Mr. Lemons' hands were not capital assets as defined by section 1221.  Rule 142(a).  This issue is a question of fact involving the manner in which petitioner

held the subject club memberships.  E.g., <u>Byram v. United States</u>, 705 F.2d 1418, 1423 (5th Cir. 1983); <u>United States v. Winthrop</u>, 417 F.2d 905, 910 (5th Cir. 1969); <u>United States v. Rosebrook</u>, 318 F.2d 316, 319 (9th Cir. 1963); <u>Bauschard v. Commissioner</u>, 31 T.C. 910, 915 (1959), affd. 279 F.2d 115, 117 (6th Cir. 1960).

In deciding whether property is held primarily for sale to customers in the ordinary course of a taxpayer's business, this and other courts look to various factors such as:

> (1)the nature and purpose of the acquisition of the property and the duration of owner-ship;(2)the extent and nature of the taxpayer's efforts to sell the property;(3)the number, extent, continuity and substantiality of the sales;(4)the extent of subdividing, developing, and advertising to increase sales;(5)the use of a business office for the sale of the property; (6)the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and(7)the time and effort the taxpayer habitually devoted to the sales.

<u>United States v. Winthrop</u>, <u>supra</u> at 910 (quoting <u>Smith v. Dunn</u>, 244 F.2d 353 (5th Cir. 1955)); see also <u>Biedenharn Realty Co. v. United States</u>, 526 F.2d 409, 415 n.22 (5th Cir. 1976); <u>Buono v. Commissioner</u>, <u>supra</u> at 199.

As we view the facts of these cases, petitioner and Mr. Dixon undertook the development of the Moonlight Bay

property through the joint venture. Their plan called for the construction of six villas and a duplex on the property and the sale of the six villas to the public in the form of "time-share" memberships in a club. To finance that development, the joint venture entered into a construction loan in the amount of $4.7 million. Petitioner and Mr. Dixon personally guaranteed the loan. After construction of the improvements, they arranged for permanent financing of the project in the form of a loan to the club, the proceeds of which would be used to pay off the construction loan. As a condition for the permanent loan, the bank required, among other things, that all of the club memberships be sold and that petitioner and Mr. Dixon personally guarantee repayment of the permanent loan.

Petitioner and Mr. Dixon had no choice but to purchase the 18 unsold club memberships in order to obtain the permanent financing for the project. Otherwise, the need to repay the construction loan, which was coming due, threatened the survival of the project and the financial position of the joint venturers, petitioner and Mr. Dixon, who had personally guaranteed the loan. The joint venturers purchased the memberships in their individual names in order to obtain permanent financing for the project with the hope that they could complete the sale of

the memberships to the public.  It was evident to the joint venturers at the time, and it is evident to us now, that the note issued by the club in connection with the club's purchase of the villas and land from the joint venture would not be satisfied until all of the club memberships were sold to the public.  The evidence does not support respondent's assertion that the joint venturers purchased the unsold club memberships for investment or for any reason other than for sale to customers.  Accordingly, we find that petitioner held the subject memberships primarily for sale to customers.  See generally King v. Commissioner, 89 T.C. 445, 457-458 (1987); Cottle v. Commissioner, supra; Kemon v. Commissioner, 16 T.C. 1026 (1951).

The second prong of our inquiry is whether petitioner held the club memberships for sale in the ordinary course of a trade or business.  Sec. 1221(1).  To find that a taxpayer was engaged in a trade or business, we must find that the taxpayer was involved in the activity with "continuity and regularity" and that the taxpayer's primary purpose for engaging in the activity was "for income or profit."  Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).

The focus of the inquiry in these cases is whether petitioner's activities rise to the level of a trade or

business and whether petitioner held the club memberships for sale to customers in the ordinary course of that trade or business. See Bramblett v. Commissioner, 960 F.2d 526 (5th Cir. 1992); Buono v. Commissioner, 74 T.C. at 205. Petitioners survey the factors used by courts to distinguish between dealers and investors in real estate and conclude that "clearly, Lemons' activities do rise to the level of a trade or business." In analyzing these factors, petitioners take into account all of the activities of the joint venture in developing, improving, and selling the property. Respondent, on the other hand, applies the same factors and concludes that petitioner was not engaged in a trade or business. In coming to this conclusion, respondent draws a sharp distinction between petitioner and the joint venture and takes into account only petitioner's individual actions with respect to the club memberships but not his actions with respect to any other aspect of the development of the Moonlight Beach property.

The premise of respondent's argument appears to be that in evaluating whether petitioner was engaged in a trade or business for the purpose of applying section 1221(1) the Court should look only to the activities petitioner undertook after he acquired the club memberships

in January 1986.  In effect, respondent appears to treat
the joint venture like a corporation, the activities of
which are not ordinarily attributable to its shareholders.
E.g., Bramblett v. Commissioner, supra at 533.  It is clear
that the trade or business of a corporation is distinct
from the trades or businesses of its stockholders.  E.g.,
Whipple v. Commissioner, 373 U.S. at 202.  On the other
hand, the trade or business of a joint venture or partner-
ship is the trade or business of each of the venturers or
partners.  See generally Flood v. United States, 133 F.2d
173 (1st Cir. 1943); Butler v. Commissioner, 36 T.C. 1097
(1961); Bauschard v. Commissioner, 31 T.C. 910 (1959);
Ward v. Commissioner, 20 T.C. 332 (1953), affd. 224 F.2d
547 (9th Cir. 1955).  In Stanchfield v. Commissioner, T.C.
Memo. 1965-305, we stated as follows:

> While we agree with the Whipple opinion that
> the trade or business of a corporation is
> distinct from the trades or businesses of
> its stockholders, we do not believe that a
> similar distinction can be made in the case
> of a partnership and its partners.

For example, in Butler v. Commissioner, supra, the issue
was whether or not certain loans made by a taxpayer to a
partnership of which he was a limited partner were to be
treated as business or nonbusiness bad debts.  We noted
that by reason of his position as a limited partner the

taxpayer was individually engaged in business. Id. at 1106. In view of the fact that the loans were made in furtherance of that business and were proximately related to the business activities of the partnership, we held that the loans were business bad debts. Id. Similarly, in Ward v. Commissioner, supra, we permitted a taxpayer who had been a partner in a partnership to deduct, as ordinary and necessary business expenses, payments in the nature of pension payments made to a former employee of the partner-ship. We noted that the taxpayer was engaged in a business within the meaning of the predecessor of section 162(a) "by reason of being a partner in a business". Id. at 343; see also Flood v. United States, supra.

Finally, in Bauschard v. Commissioner, supra, the issue presented to the Court was whether the taxpayer's activities with respect to the purchase, development, and sale of a tract of land constituted a trade or business. The taxpayer contributed two-thirds of the purchase price of an undeveloped tract of land which was placed in trust for the taxpayer and the other buyer. Id. at 913. The trust leased the property to a developer for a 5-year term for the purpose of platting, subdividing, and improv-ing the property, and it gave the developer an option of purchasing any or all of the lots. Id. The developer

formed a corporation to develop and improve the property and assigned his interest in the lease to the corporation. Id. at 914.  The taxpayer reported his share of the gains realized by the trust upon disposition of the lots as capital gains.  Id. at 915.

The Court held that the taxpayer and the developer had entered into a joint venture for the purpose of subdividing, developing, and selling the land.  Id. at 916. Since the activities of the developer and his corporation constituted a trade or business, the Court found that the taxpayer, as a member of the joint undertaking, was similarly engaged and, thus, held the property for sale to customers in the ordinary course of business.  Id. at 917. Accordingly, the Court held that the income realized from the venture must be taxed at ordinary rates.  Id.

In these cases, petitioner and Mr. Dixon undertook the improvement of the Moonlight Beach property and the sale of those improvements to the public in the form of time-share memberships in the club.  In order to obtain permanent financing for the project, they agreed between themselves to purchase any unsold club memberships and continued to market them to the public.  In effect, each of them agreed to continue the activities of the joint venture in his individual capacity.  Respondent concedes

that the joint venture was engaged in the trade or business of developing the Moonlight Beach property, and we find that petitioner continued that business in his individual capacity during 1986. We also find that petitioner engaged in that business in order to realize a profit from the joint venture's sale of the villas and related land to the club.

Annual Dues Issue

Petitioner claims to have paid annual dues of $10,500 to the beach club in 1986 with respect to the eight club memberships that he owned during the year. Petitioners assert that this expenditure, to the extent substantiated, was made to maintain the club memberships. Accordingly, petitioners argue that they are each entitled to deduct one-half of the amount paid under section 162(a) as an ordinary and necessary business expense. They do not claim to be entitled to deduct that amount under section 212.

Respondent disallowed the deductions in the notices of deficiency on the ground that "there is no business purpose for this transaction". In respondent's post-trial briefs, respondent concedes that the expenditure, to the extent substantiated, would be deductible as a business expense if the Court finds that the club memberships were held by

petitioner for sale to customers in the ordinary course of a trade or business. In that event, however, respondent argues that "petitioners have failed to substantiate" their payment of the annual dues. Petitioners bear the burden of proving that each of them is entitled to the deduction. Rule 142(a).

In the prior section of this opinion, we set forth our basis for finding that Mr. Lemons held the subject club memberships for sale in the ordinary course of a trade or business. Thus, as recognized in respondent's post-trial brief, petitioners are allowed to deduct under section 162(a) the amount of any annual dues "paid" to maintain those club memberships. The question becomes whether petitioners have proven that they paid any dues to the club. They introduced no documentary evidence to substantiate that payment. Mr. Dixon testified at trial that the joint venture "loaned" the amount of the dues to petitioner and himself and that neither of them repaid the joint venture. Mr. Dixon's testimony on this issue is as follows:

Q    Did you pay any of those dues?

A    I believe we did pay them.

Q    You did pay them?

A    Yes.  I believe the venture loaned us some money to make the payments.

Q    So you are saying the venture loaned you the money to put the down payment and also loaned you the money to make the payments on the dues.  Is that correct?

A    That is my recollection.

Q    And did you ever pay any of that money back to the joint venture?

A    No.

The record of these cases contains no documentary evidence of indebtedness of the joint venture to Mr. Dixon or to petitioner for the payment of annual dues.

During his testimony at trial, petitioner could not say for certain whether he had paid the annual dues from his own funds or whether he had received that amount from the joint venture.  Petitioner's testimony on this issue is as follows:

Q    Did you pay those dues with your own money or did you borrow that from the venture?

A    I thought I paid with my own money. I heard Mr. Dixon testify that he borrowed it from the venture, and I would assume if he did, I did.  But I don't remember it that way.  I can't swear either way.  I don't think we borrowed it from the venture.

Furthermore, if petitioner paid the annual dues with funds obtained from the joint venture, as mentioned above, there is no evidence in the record of petitioner's indebtedness to the joint venture for such payment. Therefore, based upon the record of these cases, we cannot find that petitioner "paid" annual dues of $10,500 to the beach club in 1986 as required by section 162(a). Accordingly, we hereby sustain respondent's disallowance of the deductions that petitioners claimed in the amount of one-half of such amount, $5,250.

Partnership Losses for 1987 and 1988

The partnership losses that each petitioner claimed as deductions on a Schedule E for 1987 and 1988 and the amount that respondent disallowed according to respondent's post-trial brief, are as follows:

| | 1987 | | 1988 | |
| | Loss Deducted | Loss Disallowed | Loss Deducted | Loss Disallowed |
|---|---|---|---|---|
| Speed Line Investment | ($2,091.48) | ($2,091.48) | ($2,035.02) | ($2,035.02) |
| Oakbrook III | (7,050.85) | (7,050.85) | (12,453.97) | (12,453.97) |
| Dondi Presidents' Partnership II | (24,273.40) | (24,273.40) | 422.35 | (1,431.00) |
| 1626 NY Associates Ltd. Partnership | (6,035.00) | (6,035.00) | (4,931.60) | (4,931.60) |
| Bear Creek West Rental Prop. | (10,102.50) | (10,102.50) | -- | -- |
| Haywood Lane Joint Venture | (9,082.00) | (9,082.00) | -- | -- |
| Murfreesboro Road Joint Venture | (32,104.53) | -- | -- | -- |
| Lemons & Hite | (751.37) | -- | (646.29) | -- |
| Dondi Motor Car Properties | (2,166.00) | -- | (2,283.98) | -- |
| Berkley Apartments. Ltd. Partnerships | (4,067.51) | -- | (640.68) | -- |
| Caprice Investments | (271.51) | -- | 594.00 | -- |
| Freeport-McMoran Energy Partners, Ltd. | 206.50 | -- | 6.50 | -- |
| Freeport-McMoran Resource Partners, Ltd. | -- | -- | -- | -- |
| | (97,789.65) | (58,635.23) | (21,968.69) | (20,851.59) |

The subject notices of deficiency disallowed the partnership losses claimed by each petitioner on the ground that the amount deducted was "more than you have 'at risk'". In her post-trial brief, respondent asserts that the subject partnership losses should be disallowed for two reasons. First, as to three of the partnerships, Speed Line Investment, Dondi Presidents' Partnership II, and 1626 New York Associates Ltd. Partnership, respondent asserts that the losses should be disallowed "because petitioner has not shown that his adjusted basis in any of these partnerships exceeded his distributive share of the partnership losses under §704(d)." In effect, respondent contends that petitioner had "insufficient basis" to support the deduction of the subject partnership losses. Second, as to all of the partnerships for which an

adjustment was made, other than Speed Line Investment, respondent contends that "the provisions of §469(i)(5)(B) do not allow petitioners to deduct any derivative losses related to the above partnerships."  As we understand the argument, respondent contends that petitioners are not entitled to deduct any of the losses from the subject partnerships because they are not eligible for the $25,000 offset for rental real estate activities, prescribed by section 469(i).  Under that provision, the blanket prohibition against deducting passive activity losses, contained in section 469(a), is not applicable to the portion of the passive activity loss, up to a maximum of $25,000, which is attributable to rental real estate activities in which the individual actively participates. Sec. 469(i)(1).  Respondent asserts that petitioners, who filed separate returns but did not live apart during 1987 or 1988, are described in section 469(i)(5)(B) as taxpayers to whom section 469(i) is not applicable.  As a result of being ineligible for the $25,000 offset for rental real estate activities prescribed by section 469(i), respondent argues that petitioners cannot deduct any passive activity losses.

As to respondent's first reason, petitioners contend that respondent's agent disallowed the partnership losses

"in any case where the loss claimed exceeded the capital account as shown on the K-1 (or if there was a negative capital)". Petitioners contend that respondent is "simply wrong on the facts", and, as to each partnership, petitioner "had sufficient basis in the partnership to claim the full amount of the loss shown on the K-1". Petitioners contend that Mr. Lemons was subject to "recourse liabilities" in each case and "when his capital account, whether it be positive or negative, is added to his share of recourse partnership liabilities, Lemons had more than enough basis to utilize the full amount of the loss shown on the K-1."

In passing, we note that both parties treat respondent's first reason for disallowing the partnership losses at issue; i.e., whether petitioner's adjusted basis in each of the partnerships was equal to or greater than petitioner's distributive share of the partnership loss as required by section 704(d), as the rationale for the adjustment made in the notice of deficiency; i.e., whether the amount deducted was "more than you have 'at risk'". Neither party raises section 465, which limits deductions to the "amount at risk", or discusses the effect of that section on the facts of these cases.

As to respondent's second reason for disallowing the partnership losses; i.e., that petitioner is not eligible for the $25,000 offset for rental real estate activities, provided by section 469(i), petitioners make two points. First, they assert that this "is a new theory not raised in the Notice * * *  is outside the scope of the pleadings * * * [and] was not tried by express or implied consent." Second, they note that on the Forms 8582, Passive Activity Loss Limitations, filed with their 1987 and 1988 returns, both claimed passive activity losses, but neither claimed eligibility for the $25,000 offset for rental real estate activities prescribed by section 469(i).

We do not agree with respondent's second reason for disallowing the partnership losses.  We agree with respondent that a married individual who files a separate return for any taxable year is not entitled to the $25,000 offset for rental real estate activities unless the taxpayer lives apart from his or her spouse at all times during the year.  Sec. 469(i)(5)(B).  However, even if the taxpayer is ineligible for the $25,000 offset for rental real estate activities provided by section 469(i), the taxpayer may be entitled to deduct losses from certain passive activities by reason of other provisions set forth in section 469.  For example, section 469(m) provides a

phase-in of the disallowance of losses and credits attributable to interests held on the date of enactment of section 469, defined as "pre-enactment [interests]" by section 469(m)(3)(B).  Similarly, losses from passive activities for the taxable year can be offset against the income from passive activities for that year.  See sec. 469(d)(1).

The Forms 8582 filed by petitioners for 1987 claim a deduction for the portion of petitioners' passive activity losses attributable to "pre-enactment [interests]" under the phase-in of disallowance rules set forth in section 469(m).  Similarly, the Forms 8582 filed with petitioners' 1988 returns suggest that the losses from certain passive activities were offset by income from other passive activities.  See sec. 469(d)(1).  Respondent's briefs do not explain why petitioners' ineligibility for the $25,000 offset for rental real estate activities provided by section 469(i) is in any way related to the passive activity losses claimed by petitioners on the Forms 8582 filed for 1987 and 1988.  We perceive no connection.  Accordingly, we reject respondent's second reason for disallowing the partnership losses.

Respondent's first reason for disallowing the partnership losses is that petitioner had "insufficient

basis" to support the deduction with respect to three partnerships, Speed Line Investment, Dondi Presidents' Partnership II, and 1626 New York Associates, Ltd. Partnership.  We review the record with respect to each of these partnerships.

Petitioner was a general partner in Speed Line Investment, a partnership formed to engage in the breeding and sale of thoroughbreds and quarter horses.  He held a 25-percent interest in the partnership during 1987 and 1988.  He claims that in 1985 the partnership borrowed $620,000 from the First City Savings Bank in Los Colinas and that he and Mr. Dixon personally guaranteed the loan and pledged a certificate of deposit in the amount of $120,000 and the assets of the partnership as collateral. He also claims that approximately $170,000 of the loan was outstanding at the end of 1987.  In effect, petitioner claims that his share of the liability for 1987 would have been $42,500 (i.e., $170,000 x 25 percent).  Petitioner testified that there was no change in 1988 for this liability and for the amount of the partnership's debt.

Contrary to petitioner's testimony, the Schedules K-1, Partner's Share of Income, Credits, Deductions, etc., issued to petitioner by Speed Line Investment, show that petitioner had a negative capital account as of the end of

1987 and 1988, and do not contain any entry on the lines provided for "partner's share of liabilities".  Petitioner testified that his share of partnership liability exceeded the negative balance of his capital account by more than the amount of the loss deducted for 1987 and 1988.  However, the record contains no documentary evidence to substantiate that testimony.

Petitioner was a general partner in the Dondi Presidents' Partnership II, a partnership formed to acquire and eventually resell 10 condominium units in Oceanside, California.  He held a 10-percent interest in the partnership in 1987 and 1988.  He claims that, in addition to other debts of the partnership for which he had no liability, the partnership borrowed $350,000 from Paris Savings in Paris, Texas, and he "had full liability" for that debt.  Petitioner also testified that Paris Savings eventually obtained a judgment against him with respect to that debt in the amount of $306,690.87.  Petitioners did not introduce the judgment into evidence, and the record does not state the date of that judgment.  We note that the Schedule K-1 issued to petitioner by Dondi Presidents' Partnership II for 1987 shows that petitioner's share of "nonrecourse" liabilities was $65,700 and his share of

"other" liabilities was $27,934.  For 1988, petitioners reported income from the Dondi Presidents' Partnership II.

Petitioner was a limited partner in the 1626 New York Associates Ltd. Partnership.  Petitioner testified that he paid approximately $405,000 for his interest in the partnership by making a cash downpayment and signing a promissory note.  Petitioner could not recall the amount of the downpayment or promissory note.  According to petitioner, his obligation under the note was "bonded" by Continental Casualty in Chicago, which ultimately obtained a judgment of $246,000 against him.  Petitioners did not introduce the judgment into evidence, and the record does not state the date of the judgment.

We note that the Schedules K-1 issued to petitioner by the 1626 New York Associates Ltd. Partnership show that his capital at the end of 1987 and 1988 was ($112,988.56) and ($157,628.56), respectively.  We further note that the Schedule K-1 for 1988 shows nonrecourse liabilities of $309,682 and other liabilities of $57,352, and the Schedule K-1 for 1987 shows nonrecourse liabilities of $428,488 and other liabilities of $53,057.

Petitioners make a general argument that respondent erred by disallowing losses from the subject three partnerships because the Schedules K-1, issued by the

partnerships for both of the years in issue, showed a

negative capital account.  Petitioners argue as follows:

> That was a mistake.  The capital account on these
> K-1's did not purport to show basis; it only
> showed the net of the partner's contributions
> less withdrawals plus his share of income, less
> his share of losses.  It did not take into
> account his share of recourse liabilities.  There
> is another place on the K-1 form to show the
> partner's share of liabilities, both recourse and
> nonrecourse.  In most cases, that information was
> simply not shown on the K-1.  The regulations
> provide that, under certain circumstances, a
> partnership could elect not to include that
> information on the K-1 and in many cases the
> partnership made that election.  In other cases,
> the amount shown as "at risk" was simply
> incorrect.
>
> Petitioner's testimony made it clear that
> he had sufficient basis in each partnership to
> justify the full amount of loss claimed.  The
> testimony was unchallenged.

Petitioners also argue as follows:

> Petitioner's testimony makes it very clear,
> however, that the capital accounts as shown on
> the K-1s were not his basis in his partnership
> interest.  In all cases, Lemons was liable for
> his share of recourse liabilities and the amount
> of that liability was not included in the capital
> account figure shown on the K-1.  When his
> capital account, whether it be positive or
> negative, is added to his share of recourse
> partnership liabilities, Lemons had more than
> enough basis to utilize the full amount of the
> loss shown on the K-1.

As to the adjustments made by respondent with respect to each of the subject three partnerships, Speed Line Investment, Dondi Presidents' Partnership II, and 1626 New York Associates, Ltd. Partnership, the issue is whether petitioner's distributive share of partnership loss exceeds the adjusted basis of his interest in the partnership at the end of the partnership year in which the loss occurred, such that respondent could correctly disallow the loss pursuant to the limitation imposed by section 704(d). Petitioners bear the burden of proving that respondent's adjustment is incorrect and, in that connection, they must prove Mr. Lemons' adjusted basis in each of the three partnerships at the end of 1987 and 1988. Pucci v. Commissioner, T.C. Memo. 1984-672.

Petitioners have failed to meet their burden of proof. They did not prove Mr. Lemons' adjusted basis in any of the three partnerships at the end of 1987 or 1988. They rely on Mr. Lemons' testimony which, in the case of each of the three partnerships, consists of a description of the partnership and a general statement that he was liable for partnership obligations that are not reflected on the Schedules K-1 issued by the partnership. At no time does Mr. Lemons state the amount of his basis in any of the partnerships. We agree that there may be a correlation

between a partner's basis and the sum of the partner's capital account at the end of the year and liabilities as shown on a Schedule K-1. See generally 1 McKee et al., Federal Taxation of Partnerships and Partners, par. 6.05 (3d ed. 1997). However, that general correlation is not sufficient in these cases to permit us to determine Mr. Lemons' adjusted basis in the three partnerships at the end of 1987 and 1988. Accordingly, we sustain respondent's adjustments with respect to Speed Line Investment, Dondi Presidents' Partnership II, and 1626 New York Associates, Ltd. Partnership and reject respondent's adjustments with respect to the other partnerships.

Worthless Stock Issue

Petitioners claimed losses on Schedules D, Capital Gains and Losses and Reconciliation of Forms 1099-B, due to the worthlessness of stock in a Canadian oil company, Windsor Resources. They claim that Mr. Lemons' basis in the stock was $8,882.72, and each of them claimed a deduction in the amount of $4,441.36, one-half of the alleged basis.

Petitioner testified that he was one of several persons who borrowed $100,000 to purchase stock in the company. Petitioner claims that he had a 10-percent interest in the venture and that he repaid his share

of the note, "$10,000 plus interest".  According to
petitioner, "ultimately, several years later, the stock
became worthless."  Petitioner's testimony about how he
determined that the stock had become worthless and when
the worthlessness occurred is as follows:

> Q       How did you determine that the stock
>         became worthless?
>
> A       Well, the price started going down, and
>         finally it got down to a quarter, and then
>         finally it wasn't even listed.  And finally
>         the company was put in bankruptcy and as far
>         as I --
>
> Q       Did that occur in 1986?
>
> A       I don't know when it occurred.  I think
>         it did, but I couldn't say for sure.

Petitioners claim a deduction under section 165(g)
on the ground that the stock of Windsor Resources became
worthless in 1986.  Even if we accept petitioner's
testimony that he borrowed $10,000 to invest in stock of
Windsor Resources, petitioners must still prove that the
stock became worthless in 1986.  E.g., <u>Boehm v. Commis-
sioner</u>, 326 U.S. 287, 293-294 (1945).

In view of petitioner's testimony, we cannot find that
the stock of Windsor Resources became worthless in 1986.
Petitioner testified candidly:  "I don't know when it [the
bankruptcy of Windsor Resources] occurred."  Accordingly,

we hereby sustain respondent's disallowance of the capital loss claimed by each petitioner in the amount of $4,441.36.

Self-Employment Tax Issue

As discussed above, the self-employment taxes reported by each petitioner and the amounts determined in the notices of deficiency are as follows:

Woody F. Lemons, Docket No. 16562-90

| Year | Per Return | Per Notice | Adjustment |
|------|-----------|-----------|-----------|
| 1986 | -- | -- | -- |
| 1987 | $2,334.87 | $4,465 | $2,130.13 |
| 1988 | 1,100.47 | 4,935 | 3,834.53 |

Paula S. Lemons, Docket No. 16799-90

| Year | Per Return | Per Notice | Adjustment |
|------|-----------|-----------|-----------|
| 1986 | -- | -- | -- |
| 1987 | $2,334.87 | $2,335 | -- |
| 1988 | 1,100.47 | 1,100 | -- |

It is readily apparent that the notice of deficiency issued to Mrs. Lemons does not adjust the self-employment tax that she reported.  On the other hand, the notice of deficiency issued to Mr. Lemons adjusts the self-employment tax that he reported for 1987 and 1988, but it does not explain the nature of the adjustments or their computation. The petition filed on Mr. Lemons' behalf does not take issue with these adjustments, and they were not raised at trial or in petitioners' opening brief.

Respondent's opening brief states as follows:

> Also, there are two additional adjustments.
> In the notice of deficiency issued to petitioner
> in Docket No. 16562-90 [Mr. Lemons], respondent
> did not adjust the self employment tax for the
> 1987 taxable year.  Respondent has recently
> discovered that the correct amount of such tax
> is $3,911 instead of $2,335.  Also, the adjust-
> ment to the self employment tax for taxable year
> 1987 of petitioner in Docket No. 16799-90
> [Mrs. Lemons] is also incorrect.  The amount
> should be increased from the notice of deficiency
> amount of $2,335.00 to $4,465.00.  Both of these
> adjustments, because they are computational and
> unrelated to the other adjustments in the
> notices, should be addressed at the conclusion
> of this matter under T.C. Rule 155.

Contrary to the above, the notice of deficiency issued to

Mr. Lemons, petitioner in docket No. 16562-90, does adjust

the self-employment tax reported by Mr. Lemons for 1987,

and the notice of deficiency issued to Mrs. Lemons,

petitioner in docket No. 16799-90, made no adjustment to

the self-employment tax reported by Mrs. Lemons for 1987.

Petitioners' reply brief contains the following

statement in response to respondent:

> Respondent states that there are two
> additional adjustments which were not made in the
> Notice of Deficiency relating to self employment
> tax for 1987 and that these adjustments should be
> addressed in the Rule 155 computation.  Neither
> of these adjustments was made in the Notice of
> Deficiency, neither was mentioned in either

Petition because Petitioners had no notice that these adjustments would be proposed, neither side offered any evidence about these issues, and it is too late now to raise them for the first time. Respondent would have had to timely move for permission to seek an increased deficiency and properly plead these matters for them to be issues.

We note that neither party takes issue with the adjustment made in the notice of deficiency to the self-employment tax reported by Mr. Lemons for 1988. Accordingly, that adjustment is hereby sustained. We also note that no adjustment was made in the notice of deficiency to the self-employment tax reported by Mrs. Lemons for 1988.

In the case of respondent's adjustment to the self-employment tax reported by Mr. Lemons for 1987, petitioners bear the burden of proving that respondent's adjustment is incorrect. Rule 142(a). They did not take issue with this adjustment in Mr. Lemons' petition or at trial. Accordingly, petitioners have failed to meet their burden of proof, and we hereby sustain respondent with respect to this adjustment.

As mentioned, no adjustment was made in the notice of the deficiency to the self-employment tax reported by Mrs. Lemons for 1987, and respondent has not sought to amend the Government's pleadings to raise such an adjust-

ment.  Thus, no adjustment to Mrs. Lemons' self-employment tax for 1987 is before the Court.  In passing, we note that respondent's brief, quoted above, states that Mrs. Lemons' self-employment tax for 1987 should be increased "at the conclusion of this matter under T.C. Rule 155." Respondent's brief also states that this "adjustment" is "unrelated to the other adjustments in the notices." However, if this adjustment is unrelated to the other adjustments in the notice, it would appear to be a new issue which cannot be raised for the first time either in a post-trial brief or in a Rule 155 proceeding.  See Bankers' Pocahontas Coal Co. v. Burnet, 287 U.S. 308 (1932); Cloes v. Commissioner, 79 T.C. 933 (1982); Estate of Papson v. Commissioner, 74 T.C. 1338, 1340 (1980); Estate of Stein v. Commissioner, 40 T.C. 275 (1963).

To reflect the foregoing and concessions,

Decisions will be entered
under Rule 155.